SELYA, Circuit Judge,
with whom TORRUELLA, Circuit Judge, joins,
dissenting.
I appreciate the measured tone of the majority opinion, and I agree with much of what the court writes: section 2 of the Voting Rights Act (VRA), 42 U.S.C. § 1973, verges on the opaque and the Supreme Court precedent interpreting it *13 leaves many questions unanswered. Moreover, I acknowledge that, in the ordinary course, district courts should allow vote dilution claims to proceed beyond the Rule 12(b)(6) stage. Thus, were this an arguable case, factual development would be preferable to outright dismissal.
Here, however, the case is not arguable.[1] The plaintiffs’ claim depends upon a radical premise: that a minority group whose members cannot conceivably comprise anything close to a numerical majority, even in what is from their point of view an ideally configured single-member district, can mount a vote dilution claim. Given the small size of the identified minority group in this case and the magnitude of the crossover voting on which it must rely, the claim necessarily fails. See Valdespino v. Alamo Heights Indep. Sch. Dist., 168 F.3d 848, 852-53 (5th Cir.1999); Cousin v. Sundquist, 145 F.3d 818, 828-29 (6th Cir.1998); McNeil v. Springfield Park Dist., 851 F.2d 937, 943-45 (7th Cir.1988); Parker v. Ohio, 263 F.Supp.2d 1100, 1104-05 (S.D.Ohio) (three-judge court), affd mem., — U.S. -, 124 S.Ct. 574, 157 L.Ed.2d 426 (2003). Further factual development, therefore, will only raise false hopes in the African American community while at the same time squandering scarce judicial resources.
I will be brief. The plaintiffs allege that African Americans represented approximately 26% of the relevant population in former Senate District 9 yet represent only 21% of the population in the new district (Senate District 2). They characterize this 5% differential as a political kiss of death and ask that the district lines be redrawn so that, in their ideal district, African Americans again will number 26% of the population.
. Stripped of rhetorical flourishes, the postulate underlying the plaintiffs’ claim proceeds along the following lines. Whenever a candidate preferred by African-Americans runs for the state senate in the new district, he or she will receive all the African-American votes plus no less than 32% but no more than 37% of the combined white and Hispanic votes (these being the percentages of all white and Hispanic voters necessary to form a majority in conjunction with a monolithic African American vote when African-Americans constitute 26% and 21% of the population, respectively). Whether viewed as a matter of logic, political science, or human behavior, this postulate, which assumes that the electorate’s polarization is so deeply entrenched that candidate-specific variations will operate only within a 5% margin, strikes me as fanciful. Moreover, the impetus behind it is the plaintiffs’ conviction that they can forge some sort of functional majority, i.e., that African Americans, though not numerous enough to comprise anything close to a majority in their ideal district, nonetheless will have the ability to elect a particular candidate with the aid of a large and predictable non-African-American crossover vote. Whatever may be said for functional majority claims in general — a matter on which I take no view — the plaintiffs’ functional majority claim lies well beyond the prophylaxis of section 2. The minority group described in the amended complaint comprises too small a fraction of the dis *14 trict’s total population and, therefore, must rely too heavily on crossover votes.
The plaintiffs seek to blink this reality by treating crossover voters as if they constitute part of a protected minority within the purview of section 2. Fidelity to core democratic values demands that we reject this taxonomy. Although the Gin-gles preconditions contemplate a certain degree of crossover voting, see Thornburg v. Gingles, 478 U.S. 30, 56, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1123 (3d Cir.1993), there is a point at which crossover voting becomes so large a part of the picture as to crowd out the possibility of a legally cognizable vote dilution claim. That is the case here; after all, the bricolage comprises a roughly equal mix of African American and crossover voters. Under these circumstances, allowing a vote dilution claim to go forward would make sense only if the end game were to ensure the success of candidates favored by minority groups. That is plainly not the proper object of section 2 of the VRA, which is a law aimed at ensuring equality of opportunity rather than at guaranteeing the electoral success of particular candidates. See Johnson v. De Grandy, 512 U.S. 997, 1014 n. 11, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994).
The plaintiffs’ claim also trips over the third Gingles precondition. See Gingles, 478 U.S. at 56, 106 S.Ct. 2752 (explaining that plaintiffs must show the existence of majoritarian bloc voting sufficient to defeat minority-preferred candidates most of the time). A showing of majoritarian bloc voting is structurally inconsistent with the plaintiffs’ exposition of their case. Their reliance on a high level of crossover voting, ranging upward from a minimum of 32% and nearly equaling the whole of the African American vote, belies any majoritarian bloc voting and thus defenestrates their claim of illegal vote dilution. See Abrams v. Johnson, 521 U.S. 74, 92-93, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997) (affirming lower court decision that average majority crossover voting of 22% to 38% is sufficient to demonstrate the “general willingness of [majority] voters to vote for [minority] candidates” (internal quotation marks omitted)); cf. Voinovich v. Quilter, 507 U.S. 146, 151-52, 158, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (approving lower court’s finding of no majority bloc voting where “black candidates have been repeatedly elected from [single-member] districts with only a 35% black population”).
The plaintiffs showcase Senator Walton’s past electoral successes as proof of the cogency of their ability to elect claim— but that datum is a two-edged sword. Consistent electoral success on the part of a racial or ethnic minority group that comprises considerably less than a numerical majority of the electorate is a telling indi-cium of the absence of majoritarian bloc voting and, thus, is presumptively inconsistent with an actionable vote dilution claim. See Gingles, 478 U.S. at 102, 106 S.Ct. 2752 (O’Connor, J., concurring); Overton v. City of Austin, 871 F.2d 529, 540 (5th Cir.1989) (per curiam); see also Brooks v. Miller, 158 F.3d 1230, 1241 (11th Cir.1998); Turner v. Arkansas, 784 F.Supp. 553, 570-71 (E.D.Ark.1991) (three-judge court), aff'd mem., 504 U.S. 952, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992).
In short, I do not believe that section 2 of the VRA authorizes vote dilution claims that are wholly dependent upon massive crossover voting. There is a critical distinction between minority-preferred candidates who lose because redistricting excludes too much of the minority electorate from a particular district (illegal vote dilution) and minority-preferred candidates who lose because they do not attract enough votes from other constituencies *15 within the district (legal majoritarian rule). The amended complaint, even when taken at face value, blurs this distinction.
Some vote dilution cases are sufficiently clear that, on any rational view of the facts alleged, further proceedings are inappropriate. This is one of them. Accordingly, I respectfully dissent from the court’s decision. Left to my own devices, I would affirm the order of dismissal.

. There are obvious dangers in applying the principle favoring further factual development too liberally. If one is willing to split an infinite number of hairs, it always will be possible to conjure up remote scenarios that might be disinterred during discovery (and, thus, might prevent the allowance of a motion to dismiss). Rule 12(b)(6) does not invite courts to engage in such endless surmise; rather, "[t]he method of Rule 12(b)(6) requires courts ... to resolve all realistic possibilities in the pleader’s favor.” Garrett v. Tandy Corp., 295 F.3d 94, 105 (1st Cir.2002) (emphasis supplied).