**Willie COFIELD and Frank Cox, Plaintiffs,**

v.

**The CITY OF LAGRANGE, GEORGIA and John W. Bell, Superintendent of Elections, Defendants.**

**Civil Action No. 3:93–CV–97–JTC.**

United States District Court, N.D. Georgia. Newnan Division.

Feb. 21, 1997.

Neil T. Bradley, Moffatt, Laughlin, McDonald, American Civil Liberties Union, Atlanta, GA, Mary Ellen Wyckoff, New York City, Noel David Buffington, Office of Noel David Buffington, St. Simons Island, GA, Jerry Wilson, Office of Jerry Wilson, Lithonia, GA, for plaintiffs.

James R. Lewis, Jeffrey Marshall Todd, Lewis, Taylor & Todd, LaGrange, GA, William Keith McGowan, John C. Daniel, III, Martin, Snow, Grant & Napier, Macon, GA, for defendants.

## ORDER

CAMP, District Judge.

This action is before the Court following a bench trial that ended on April 23, 1996. The parties have submitted Proposed Findings of Fact and Conclusions of Law [# 67–1, # 68–1, & # 70–1].

## I. INTRODUCTION

Plaintiffs originally filed this case under Sections two and five of the Voting Rights Act of 1965, 42 U.S.C. §§ 1973 and 1973c. At this time, Plaintiffs are pursuing claims under Section two of the Voting Rights Act and under the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution. Plaintiffs allege that the procedure by which voters in LaGrange elect municipal officials dilutes the opportunity of minority citizens to elect officials of their choice.

Historically, the City of LaGrange selected its Mayor and City–Council members in an at-large election. In early 1993, the City devised a new plan that employed a combination of district and at-large elections. When elections pursuant to the new plan were scheduled without being pre-approved by the Justice Department, Plaintiffs petitioned this Court for injunctive relief. A three-judge district court, in accordance with the provisions of 28 U.S.C. § 2284 and 42 U.S.C. § 1973(c), enjoined the elections because the City had failed to secure approval as required by the Voting Rights Act. As a result, that election plan was repealed, and Defendants submitted subsequent plans to the Justice Department. The Justice Department also objected to those plans. During this time, no City–Council elections were held.

Eventually, Defendants decided to return to the original at-large plan provided for in the City Charter. Plaintiffs now challenge that at-large system under Section two of the Voting Rights Act which prohibits any procedure that results in minority citizens having less opportunity than other members of the electorate to elect officials of their choice.

The three-judge court remanded the case to this judge for a resolution of the Section two and the Constitutional issues. A trial on the merits of Plaintiffs' claim was held between April 3, 1996, and April 23, 1996.

In summary, the evidence shows that the elected officials in LaGrange have been responsive to the demands of its minority citizens. But, despite their efforts, the City has been unable to craft an election plan that satisfies everyone. The City's failure leaves this Court with the difficult task of deciding whether the present method of electing City officials violates the United States Constitution and the Voting Rights Act.

Several facts are evident. First, the African–American population of LaGrange is largely segregated, and the City could be divided into districts, at least two of which would contain a substantial majority of African–American voters.

Second, by requiring candidates to declare for a specific post and to be elected by a majority, the minority voters are unable to elect representatives without the assistance of a large portion of the white electorate. Approximately 37% of LaGrange's voting-population are African–American. Accordingly, even if every African–American voter in LaGrange voted, and for one candidate, the candidate would also have to receive a substantial percentage of the votes of white citizens in order to be elected.

The expert testimony presented at trial is largely inconclusive. The statistical evidence is based upon such a small sample that the deductive leap to reach a legal conclusion is too great. Furthermore, the elections that the experts analyzed are fraught with special circumstances such as the pendency of this case. The single conclusion that can be drawn from the expert testimony is that LaGrange City–Council elections exhibit racially polarized voting.

Even though some of the statistics are a hopeful indicator of minority-electoral success, these statistics must be viewed in a larger context. LaGrange, as well as other

Georgia communities, has a long history of official discrimination. Vestiges of segregation remained into the 1970s. The black schools during the era of segregation were run down, overcrowded, and only went through the eleventh grade. Throughout this time period, the African–American schools enjoyed significantly less resources than the schools attended by white students.

The present effects of this discrimination are real. Even today, a majority of black residents do not have high school diplomas, whereas 65% of white residents have completed high school. Only 166 black residents of LaGrange have bachelor's degrees, compared to 1447 white residents of LaGrange.

Great economic disparity exists between the African–American and white citizens of LaGrange. Thirty-five percent of African–Americans live below the poverty line (more than 50% of African–Americans under five years old), while only 10% of the white residents do. The per capita income of African–American residents is approximately $6,000 as compared to approximately $16,000 for white residents. Unemployment among African–American citizens of LaGrange is three times as high as among white citizens.

These lingering effects of Georgia's history of discrimination continue to translate into diminished political influence and opportunity for LaGrange's African–American citizens. Experienced black politicians, who have successfully run for office in Troup County, testified at trial that a minority candidate would have little success in at-large elections for the City Council. For example, Mr. Richard English, who is presently a County Commissioner, testified he would not run in an at-large election for any office in either Troup County or the City of LaGrange.

Finally, when the history of minority participation in the LaGrange City Council is examined from broadest perspective, one telling fact emerges. In modern times prior to 1995, only one African–American was elected to City office in LaGrange. As commendable as his success has been, the election of Mr. Glenn Robertson does not alone establish that the political process of LaGrange has been open to minority participation.

On one hand, these facts do not evince intentional discrimination. No significant evidence has been presented which indicates that the City of LaGrange decided to maintain its at-large election system in order to effectuate a discriminatory purpose. Quite to the contrary, the evidence established that the City honestly and diligently attempted to achieve a fair and politically viable resolution to the districting dispute. Accordingly, this Court concludes that Plaintiffs failed to establish a constitutional violation.

On the other hand, under the standards established by Congress in passing the Voting Rights Act, as those standards have been interpreted by our courts, Plaintiffs have shown that their ability to participate in the political process in LaGrange has been diluted by the present manner of electing City officials. In reaching this result, the Court makes the following Findings of Fact and Conclusions of Law.

## II. FINDINGS OF FACT

### The Parties

1.

Plaintiffs Willie Cofield and Frank Cox are African–American residents of, and registered voters in, the City of LaGrange, Georgia.

2.

Defendant City of LaGrange, Georgia, is a municipal corporation organized under the laws of the State of Georgia.

3.

Defendant John W. Bell is the Superintendent of Elections for the City of LaGrange. Part of his duties include the supervision of the elections for members of the LaGrange City Council.

### The Geographical Compactness of the Minority Population

4.

According to the 1990 Census, the population of LaGrange is 25,597. Approximately 10,840 (or 42.35%) LaGrange residents are African Americans. The voting age popula-

tion of LaGrange is 18,581—57.65% white and 37.1% black.

### 5.

African-American citizens of LaGrange reside primarily in the south and eastern portions of the city. The African–American population of LaGrange is sufficiently large and geographically compact to constitute a majority in more than one single-member district. Defendants did not seriously contest this fact.

### 6.

Plaintiffs introduced a number of feasible districting plans for LaGrange City–Council elections.

### *History of the LaGrange City Government*

### 7.

The original Charter for LaGrange was enacted in 1828. The charter established a governing authority of five City Commissioners who were elected in at-large elections.

### 8.

In 1856, the Georgia General Assembly enacted a new charter. This charter created a governing body composed of a six-member City Council and a Mayor. Under this charter, the City–Council members and the Mayor were elected through at-large elections.

When this charter was enacted, only "free white" residents could vote. In addition, at this time, only a plurality of the vote was necessary to be elected.

### 9.

Subsequent city charters, which were passed in 1901 and 1968, retained the Council/Mayor form of government. The 1968 charter introduced a majority vote requirement and runoff elections. The charter was amended in 1980 to provide for staggered terms of office for the Council members.

### 10.

Currently, the City Council and Mayor constitute the governing body of LaGrange. City–Council members serve four-year terms. To be elected to the City Council, or to be elected Mayor, a candidate must receive a majority of the votes cast. In addition, Council members are elected to fill numbered posts.

### *The Districting Dispute*

### 11.

In 1992, the Troup County NAACP and the Troup County Coalition began to lobby the City Council to change from at-large elections to district elections. They presented a districting plan to the City Council. This plan included six districts. Three of these districts would have been majority-black districts ("the 3–3 plan").

### 12.

In early 1993, the City devised a new plan for district elections. Under the proposed system, four Council members would have been elected from single-member districts, and the other two members and the Mayor would have been elected through at-large elections ["4–2" plan]. The City described this new districting scheme as calling for the creation of "two predominantly black districts, two predominantly white districts and two at-large districts."

### 13.

The NAACP objected to at-large seats because they believed that a white candidate would always win such seats.

### 14.

On March 4, 1993, Governor Miller signed an act that provided for a voter referendum to select a new plan for electing the LaGrange city government. The 3–3 plan was not included in the referendum.

### 15.

On June 15, 1993, the voters of LaGrange adopted the 4–2 election plan.

### 16.

The City submitted the 4–2 plan to the U.S. Attorney General for Section-five pre-clearance on July 12, 1993. On December 13, 1993, the Attorney General objected to Defendants' proposed districting plan.

### 17.

In January 1994, the City Council created a bi-racial commission to study the redistricting issue. The members of this committee were all appointed by City–Council members.

The bi-racial committee imposed on itself a requirement of a nine-vote majority to present a plan to the City Council.

The committee was unable to reach a nine-vote majority. However, in a secret ballot, eight members of the committee favored a plan called the "2–2–1–1–1" plan. This plan called for two predominantly black districts, two predominantly white districts, one super-black district, one super-white district, and one at-large district. The committee forwarded this plan to the Mayor and Council without endorsement.

18.

The LaGrange City Council unanimously voted to seek local legislation to implement the 2–2–1–1–1 plan. Although the Mayor vetoed the plan, the Council again passed it with a unanimous vote. The 2–2–1–1–1 plan was eventually adopted by the Georgia General Assembly and signed into law by the Governor on March 10, 1994. However, this plan also failed to receive preclearance from the Attorney General and could not be implemented.

19.

The City Council eventually abandoned the idea of districting and once the injunction was lifted, returned to the at-large system.

### The History of Black Candidacy for the LaGrange City Council

20.

Mr. Glenn Robertson was the first African–American candidate for a seat on the LaGrange City Council.

21.

Mr. Robertson first ran in the 1968 Democratic primary against a white opponent. He lost with 41.2% of the vote.

22.

In 1970, Mr. Robertson ran in a special Democratic primary and won by 675 votes over a white opponent. In the special election that followed, he defeated a white Republican opponent. Although the Democratic party enjoyed considerable strength in local politics at the time, Mr. Robertson won by only two votes. The turnout in the 1970 election was the largest in LaGrange history. Eventually, the election was voided in a successful challenge. Mr. Robertson won the new election by 49 votes in a turnout that was not exceeded again until the 1995 elections.

23.

Mr. Robertson ran as an unopposed incumbent in 1971, 1975, and 1979. In the 1983 election, Mr. Robertson was opposed by another African–American in the Democratic primary. Mr. Robertson easily won the primary and was not opposed in the general election. He ran unopposed again in 1987. In 1991, he was opposed in the Democratic primary by a white candidate, Sy Chase. Mr. Robertson won by a wide margin (1,773 to 568 or 75.7% to 24.3%).

24.

In the 1991 general election, African–American Deborah Hicks–Shealey ran as a write-in independent candidate against party candidates Kay Durand and Marion Dunn, who are white. Ms. Hicks–Shealey received 39 votes.

This Court does not attach much weight to this evidence. As a write-in independent candidate opposing candidates from major political parties, Ms. Hicks–Shealey was not likely to defeat her opponents, regardless of race.

25.

In 1993, the elections for City Council became non-partisan. These elections, however, were not held because of this litigation.

### 1995 Elections

26.

In the 1995 elections, five African–Americans ran for City Council.

27.

George Moore, who is African–American, ran unopposed and was elected.

28.

Rev. J.R. Ware, who is African–American ran as an incumbent and defeated a white opponent. Rev. Ware, who had been appointed in January 1995 to fill a vacant seat, received 55.5% of the vote.

**29.**

Betty Patterson (African–American) lost to a white candidate who ran as an incumbent. She received 28.9% of the vote.

**30.**

A white candidate won with 70% of the vote over African–American candidate Bertha Skinner.

**31.**

Yvonne S. Pittman (African–American) received 32.7% of the vote and was defeated by her white opponent who ran as an incumbent.

**32.**

Therefore, two African–American candidates won seats in at-large elections in 1995. Of these two candidates, one ran unopposed, and one ran as an incumbent.

**33.**

Of the three unsuccessful African–American candidates, two lost to candidates who ran as incumbents.

**34.**

In the 1995 elections, the issue of districting was strongly connected to the African–American community and the organizations representing them, such as the NAACP and the Troup County Coalition. The four successful white candidates for City Council publicly campaigned against conducting city elections by district. The three African–American candidates who lost campaigned in favor of districting.

**35.**

Currently, two African Americans serve on the six-member City Council.

### Expert Testimony on the Existence and Impact of Racially Polarized Voting in LaGrange

#### Plaintiffs' Expert

**36.**

Plaintiffs introduced the testimony and report of Dr. Robert Davis. Dr. Davis is a professor of sociology at the University of North Carolina Agricultural and Technical in Greensboro, North Carolina. Dr. Davis teaches courses that involve statistical methodology. Both his training and his current teaching responsibilities include regression analysis and extreme-case, or homogeneous precinct, analysis. Dr. Davis has also conducted research and published articles that involve regression analysis.

**37.**

In order to evaluate the degree of racially polarized voting in LaGrange, both Dr. Davis and Defendants' expert witness used "ecological regression" analysis and "homogenous precinct", or "extreme-case", analysis. "Regression" analysis estimates the relationship between variables. In the present context, these variables are the race of the voter and the candidate for whom the voter cast his or her vote. "Homogenous precinct" analysis is based on actual votes cast in a specific voting precinct that is composed of voters who almost universally share a particular characteristic. In this case, race was the uniform characteristic, and both experts examined only precincts that were composed of over 90% of each race.

**38.**

Both experts analyzed "endogenous" and "exogenous" elections. "Endogenous" elections are elections for the offices that are at issue in the litigation. Therefore, in this case, the "endogenous" elections are elections for the LaGrange City Council. "Exogenous" elections are any elections other than the elections for the offices at issue. "Exogenous" elections are relevant to the extent that the results from these elections allow an inference to the voting patterns in LaGrange.

**39.**

Dr. Davis analyzed only elections that involved at least one black candidate.

**40.**

Dr. Davis analyzed four endogenous elections. All of these elections were for LaGrange City Council in 1995. His regression analysis of these elections estimated the percentage of black voters who supported the African–American candidate (B/B%), the percentage of white voters who supported the African–American candidate (Xover%), the degree to which the distribution of votes can be attributed to race ($R^2$), and the statistical degree of confidence in the regression analy-

sis (TSAT). According to Dr. Davis, a TSAT of greater than 2 indicates a statistically significant result. In other words, as Dr. Davis testified, without a TSAT of greater than 2, an expert cannot conclude that the results were not due to random chance.

The following table, which is reproduced from Plaintiffs' exhibit # 229, summarizes Dr. Davis' analysis of the endogenous elections:

| Candidate | B/B% | X over % | $R^2$ | TSAT |
|---|---|---|---|---|
| Skinner | 82.47 | 12.79 | .980 | 18.96 |
| Patterson | 84.53 | 8.83 | .922 | 9.12 |
| Pittman | 86.27 | 11.22 | .899 | 7.89 |
| Ware | 80.68 | 49.38 | .382 | 2.08 |

As the table indicates, according to Dr. Davis, in three of the four elections, at least 90% of the vote distribution can be attributed to race.

### 41.

Based on these results, Dr. Davis concluded that the LaGrange City–Council elections in 1995 exhibited a high degree of racially polarized voting. First, Dr. Davis concluded that the results of each analysis were statistically significant. Dr. Davis then noted that with respect to each race, over 80% of the minority voters supported the minority candidate. Conversely, Dr. Davis' analysis revealed that no minority candidate received a majority of the white vote, although Rev. Ware received 49.30%.

### 42.

Dr. Davis also analyzed ten exogenous elections. These elections included general elections and primaries for a number of state and federal offices. For nine of these elections, Dr. Davis performed a regression analysis, and for one, he performed a homogenous precinct analysis. In the single homogenous precinct analysis, Dr. Davis found that Richard English received 77.60% of the African–American vote.

The following table, which uses the same abbreviations as the above table, summarizes the results of Dr. Davis' regression analysis of the exogenous elections:

| Candidate | Office Sought | Date | B/B% | Xover% | $R^2$ | TSAT |
|---|---|---|---|---|---|---|
| Edmonson | County Coroner | 1980 | 71.16 | 4.32 | .878 | 8.06 |
| Robertson | State Elector | 1980 | 78.77 | 63.59 | .259 | 0.41 |
| Tibbs | U.S. Senate (sic) | 1984 | 51.88 | 25.50 | .140 | 0.79 |
| Tatum | School Board | 1986 | 96.80 | 31.90 | .910 | 4.50 |
| Young | Gov. | July 1990 | 88.31 | 2.61 | .989 | 33.83 |
| Young | Gov. | Aug. 1990 | 83.43 | 8.45 | .963 | 18.36 |
| Von Epps | State Rep. | 1992 | 78.08 | 20.85 | .931 | 6.37 |
| Jackson | President | 1988 | 98.95 | 8.75 | .955 | 16.69 |
| Sears–Collins | Ga. Supreme Court | 1992 | 31.76 | 38.23 | .515 | 3.71 |

43.

As was the case with the endogenous elections, Dr. Davis concluded that these results indicated racially polarized voting. Of seven elections which produced statistically significant results, a majority of African–American voters preferred the African–American candidate six times. Out of these six races, none of the African–American candidates received a majority of the white vote. Furthermore, Dr. Davis' homogenous analysis of Richard English' race for County Commission also indicated that he received a majority of the votes cast by African–Americans.

44.

Dr. Davis analyzed only the extent of racially polarized voting in each of these elections. He did not include the ultimate results of these elections in his report.

### Defendants' Expert

45.

Defendants introduced the report and testimony of Dr. Michael A. Maggiotto. Dr. Maggiotto is a political science professor at Bowling Green State University. Dr. Maggiotto teaches and publishes in the area of American political behavior. He has published a significant number of articles many of which involve the statistical analysis of various political phenomena. In addition, Dr. Maggiotto has testified as an expert witness in numerous voting rights cases.

46.

Dr. Maggiotto conducted analyses that were similar to Dr. Davis' analyses. He analyzed endogenous and exogenous elections and performed both regression and homogenous precinct analyses.

47.

Unlike Dr. Davis, however, Dr. Maggiotto concluded that because of insufficient data, a regression analysis of voting in LaGrange would not yield reliable results. Dr. Maggiotto found that before 1995, LaGrange consisted of only four voting precincts, and, therefore he did not perform a regression analysis on the 1991 City–Council elections. Furthermore, although he performed a regression analysis on the 1995 City–Council elections, the range of results that fell within the 95% confidence interval varied to the extent that Dr. Maggiotto concluded that the results were not reliable.

48.

Accordingly, Dr. Maggiotto based his conclusions with respect to the endogenous elections on a homogenous precinct analysis. The 1991 and 1995 election cycles were the only two City–Council election cycles that included homogenous precincts (i.e. two precincts composed of 90% of each race). The following table summarizes the results of Dr. Maggiotto's analysis of the endogenous elections:

| Candidates | Percentage of Black Votes | Percentage of White Votes | Election |
|---|---|---|---|
| Chase | 12.4 | 23.0 | 1991 City Council Primary |
| **Robertson** [(B)] * | **87.6** | 77.0 | |
| **Durand** * | **84.8** | 80.1 | 1991 City Council Primary |
| Fincher | 15.2 | 19.9 | |
| Traylor | **54.9** | 31.5 | 1991 City Council Primary |
| **Woodward** * | 45.1 | 68.5 | |
| **Durand** * | **74.6** | 80.5 | 1991 City Council General |
| Hicks | 16.2 | .8 | |
| Shealy [(B)] | 9.2 | 18.7 | |
| Dunn | | | |
| **Woodward** * | **83.3** | 73.6 | 1991 City Council General |
| Bagley | 16.7 | 26.4 | |
| Skinner [(B)] | **80.8** | 13.2 | 1995 City Council General |
| * **Traylor** | 19.2 | 86.8 | |
| **Durand** * | **57.9** | 65.9 | 1995 City Council General |
| Jones | 42.1 | 34.1 | |
| **Lukken** * | 20.3 | 92.5 | 1995 City Council General |
| Patterson [(B)] | **79.7** | 7.5 | |
| **Gregory** * | 15.1 | 88.4 | 1995 City Council General |
| Pittman [(B)] | **84.9** | 11.6 | |
| Chase | 12.0 | 47.9 | 1995 City Council General |
| **Ware** * [(B)] | **88.0** | 52.1 | |

* Indicates which candidate won the election.
[(B)] indicates a minority candidate.

---

49.

Dr. Maggiotto also performed a homogenous precinct analysis on fourteen exogenous elections. Dr. Maggiotto limited his examination of exogenous elections to those that involved at least one African–American candidate. In addition, Dr. Maggiotto analyzed all elections in which all LaGrange precincts participated and which included homogenous precincts for each racial group. The "win-

ning" candidate is defined as the candidate that received the most votes in LaGrange.[1]

The following table summarizes the results of the exogenous elections:

| Candidates | Percentage of Black Votes | Percentage of White Votes | Election |
|---|---|---|---|
| Hill [(B)] | 14.7 | 13.1 | 1986 Gubernatorial |
| **Miller** * | 85.3 | 86.9 | Primary |
| | | | |
| Babbit | .1 | .5 | 1988 Presidential |
| Dukakis | 1.9 | 21.7 | Primary |
| Gephardt | .7 | 7.7 | |
| Gore | 3.0 | 49.8 | |
| Hart | .6 | 2.3 | |
| **Jackson** * [(B)] | **91.6** | 16.1 | |
| Simon | 1.9 | 1.1 | |
| Uncommitted | .1 | .8 | |

1. The Court notes that Dr. Maggiotto's definition of winning is somewhat suspect. For City–Council elections, LaGrange requires a successful candidate to receive a majority of the votes cast. Accordingly, Dr. Maggiotto's use of a plurality to define winning does not accurately reflect a race for the LaGrange City Council. This apparent analytical shortcoming did not significantly alter the basis for Dr. Maggiotto's conclusion.

| Candidates | Percentage of Black Votes | Percentage of White Votes | Election |
|---|---|---|---|
| Pafford * | 44.1 | 71.4 | 1988 Primary for |
| Smith (B) | 55.9 | 28.6 | Public Service Commissioner |
| Jones * | 13.2 | 75.9 | 1988 Primary for |
| Talley (B) | 86.8 | 24.1 | Sheriff |
| Barnes | 2.7 | 26.8 | 1990 Primary for |
| Maddox | 0 | 1.4 | Governor |
| McDonald | .3 | 9.8 | |
| Miller * | 12.0 | 49.4 | |
| Young (B) | 85.1 | 12.6 | |
| Bailey | 16.2 | 4.9 | 1990 Primary for |
| Berry | 13.5 | 14.0 | Lieutenant |
| Goolsby | 2.6 | 1.6 | Governor |
| Hill (B) | 7.3 | 1.6 | |
| Howard * | 21.9 | 47.7 | |
| Kennedy | 29.5 | 19.5 | |
| Pannell | 2.9 | 4.2 | |
| Stoner | 1.6 | 1.8 | |
| Stumbaugh | 4.5 | 4.7 | |
| Barber * | 39.1 | 69.0 | 1990 Primary for |
| Brannon | 19.0 | 14.0 | Public Service |
| Scott (B) | 41.9 | 17.0 | Commissioner |
| Durden * | 14.5 | 25.7 | |
| Glitsis | 14.5 | 22.2 | |
| Irwin | 14.6 | 16.4 | |
| Powers | 13.3 | 15.7 | |
| Smith (B) | 29.9 | 6.7 | |
| Tibbetts | 13.3 | 13.3 | |
| Benham * (B) | 68.0 | 65.6 | 1990 Supreme Court |
| Salter | 32.0 | 34.4 | |
| Blackburn | 31.0 | 36.5 | 1990 Court of |
| Cooper * (B) | 69.0 | 63.5 | Appeals |
| Miller* | 13.5 | 77.6 | 1990 Party Runoff |
| Young (B) | 86.5 | 22.4 | |
| Johnson | 13.4 | 16.1 | 1992 Primary for |
| Poythress | 17.5 | 40.1 | Labor Commissioner |
| Scott * (B) | 69.1 | 43.8 | |
| Boswell | 27.8 | 51.9 | 1992 Supreme Court |
| Sears-Collins * (B) | 72.2 | 48.1 | |
| Poythress | 15.4 | 56.9 | 1992 Runoff for |
| Scott * (B) | 84.6 | 43.1 | Labor Commissioner |

* Indicates which candidate won the election.

(B) indicates a minority candidate.

**50.**

Based on the results summarized in the two tables above, Dr. Maggiotto made several specific conclusions.

In all ten endogenous elections that he examined, both white and black voters "preferred" one of the candidates. Out of these ten races, the African–American preferred candidate won six times. However, in all six, the minority-preferred candidate was also the preferred candidate of white voters.

Out of the ten endogenous elections that Dr. Maggiotto examined, six involved black candidates. The African–American candidate won two of these elections. However, one of the unsuccessful African–American candidates was Ms. Hicks–Shealy who ran as a write-in candidate against established opponents.

Dr. Maggiotto then examined fourteen exogenous elections that involved at least one black candidate and in which all of LaGrange's precincts participated. Out of these fourteen elections, eleven included a minority-preferred candidate. Out of these eleven elections, the minority-preferred candidate "won", or in other words placed first in the LaGrange precincts, in seven of the elections.

**51.**

Based on these specific conclusions, Dr. Maggiotto offered his expert opinion. First, he found that "the electoral choices of the African–American community do not appear usually to have been defeated by white bloc voting in LaGrange City–Council elections" (emphasis added). At trial, Dr. Maggiotto testified that he qualified his conclusion (with the language "appear") because he believed that analyzing only two elections cycles was insufficient to support a more definitive conclusion. Second, Dr. Maggiotto unequivocally concluded that "the electorial choices of the African–American Community are not usually defeated by white bloc voting in exogenous elections examined within LaGrange city precincts."

**52.**

Dr. Maggiotto did not offer an opinion on the issue of voter polarization. His conclusions focused on the results of the elections that he analyzed. As his report indicates, Dr. Maggiotto's opinion was in response to the question whether "the candidate preferences of African–Americans in LaGrange city elections are usually defeated by white bloc voting."

**53.**

The Court found both experts to be credible witnesses who used more or less appropriate methods. However, their results were derived from limited data that was not necessarily representative of voting patterns in LaGrange. Dr. Davis' data was particularly narrow because he did not offer any explanation as to how he selected the elections that he analyzed.

### Lay Testimony Relating to the Existence and Impact of Racially Polarized Voting in LaGrange

**54.**

State Representative Carl Von Epps testified for Plaintiffs about the existence of racially polarized voting in LaGrange. Representative Von Epps represents District 131 in the Georgia House of Representatives. His district includes portions of Troup County. In this capacity, Representative Von Epps serves on the Congressional and State Reapportionment Committee. Moreover, Representative Von Epps has actively participated in state and local politics since his unsuccessful 1977 race for the school board.

**55.**

Representative Von Epps testified that LaGrange-area elections are racially polarized. Specifically, he testified that in his successful 1992 race for the legislature, he carried all of the majority African–American voting precincts in his district but won none of the majority-white precincts. Representative Von Epps testified that he believed, but was not certain, that his 1994 race included similar results. Furthermore, Representative Von Epps stated that his elections have frequently involved racial overtones.

. 56.

Representative Von Epps has significant experience in state and local elections in LaGrange and the Troup-county area. His opinions were based on this extensive political experience and his personal interactions throughout his political career. His testimony was reliable, and because of his significant political experience, is entitled to some weight.

57.

Plaintiffs also offered the testimony of Richard English on the issue of racially polarized voting. Mr. English has been living in LaGrange for over thirty years and has served on the Troup County Commission for eighteen years. He was the first, and remains the only, African–American member of the Troup County Commission. Mr. English represents a district which is composed of a majority of African–Americans.

58.

Mr. English testified both on the issue of racially polarized voting and the potential success of African–American candidates in at-large elections. Mr. English expressed his opinion that black voters tend to vote for African–American candidates and that white voters tend to vote for white candidates. In addition, he testified that he would not run for an at-large seat on the county commission because he does not believe that a black candidate could win an at-large election in Troup County. Mr. English testified that in recent years, three African–American candidates have unsuccessfully run for at-large seats on the county commission. Mr. English's testimony was also credible and deserves consideration.

59.

Plaintiffs Willie Cofield and Frank Cox also testified that they believed that racially polarized voting was common in local elections.

### Evidence of Racial Disparities in LaGrange, Georgia

60.

African-Americans have in the past been subject to legal and cultural segregation in Georgia and specifically in LaGrange.

61.

Black residents did not enjoy the right to vote until Reconstruction. Moreover, early in this century, Georgia passed a constitutional amendment establishing a literacy test, poll tax, property ownership requirement, and a good-character test for voting. This act was accurately called the "Disfranchisement Act."

Such devices that limited black participation in elections continued into the 1950s. Even after the passage of the Voting Rights Act, Georgia imposed a majority vote requirement and post system for municipal and other elections.

62.

In 1954, voting in LaGrange was racially segregated. African–American residents voted in the Courthouse basement, while white residents voted upstairs.

63.

For many years, LaGrange, along with all of Georgia, maintained legally segregated public schools. This segregated system continued until 1970.

64.

When Plaintiff Frank Cox attended city schools during segregation, the school system offered only eleven grades for blacks. The white schools offered twelve grades. Further, East Depot, the black high school, housed an elementary school in the same building. The local white schools did not share facilities in this manner.

65.

Several witnesses testified that the black schools were in rundown condition.

66.

In 1993, the City of LaGrange and Troup County consolidated their school systems.

#### 67.

According to the testimony of Plaintiffs, the predominantly black school system was seen in a negative light by the business community and others. Minority residents complained to the school board and to federal officials that they were unfairly treated in the school system.

#### 68.

The education level of LaGrange residents varies by race. A majority of African–American residents over age twenty-five do not have a high school diploma. On the other hand, almost 65% of white citizens have at least a high school diploma. Of white residents over age twenty-five, 1,447 have at least a bachelor's degree. Only 166 African–American residents of LaGrange in this age group have college degrees.

#### 69.

Income and employment disparities exist between the races in LaGrange. For instance, more than one-third (35.33%) of African–Americans in LaGrange were living below the poverty level in 1989 as compared to 10.56% of whites. In addition, the percentage of African–American residents under five years old who lived below the poverty line in 1989 was above 50%. This rate is almost four times that of white residents within the same age group. Per capita income for LaGrange's black residents in 1989 was $6,370.00 and $16,433.00 for white residents.

#### 70.

The median income for white families is more than twice that of black families ($35,-345.00 to $17,278.00). The median income for families with children under the age of eighteen is $38,932.00 for white families and $16,820.00 for African–American families. For families with preschool-age children, the median income is $30,526.00 for white families and $11,055.00 for black families.

#### 71.

The employment figures for LaGrange show a similar disparity. The unemployment percentage of African–American residents is nearly three times that of white residents. There are four times as many white professionals as black professionals. Of the African–American professionals, the largest category are schoolteachers, which is a traditionally low-paying profession. More than six times as many white people work in white-collar positions.

#### 72.

The economic disparity between the races in LaGrange translates into a disparity in the ability to impact the local political process. For example, in the 1995 elections for City Council, none of the African–American candidates received more total monetary contributions than any of the white candidates. The African–American candidates received an average of $825.12 in contributions, and the white candidates received an average of $2,825.90 per candidate.

#### 73.

African-American residents are registered to vote at a much lower rate than the white residents of LaGrange. For example, the evidence indicated that in 1991, approximately 41.6% of eligible African–American residents were registered to vote. For this same time period, approximately 74.1% of white residents were registered. The registration estimates for the 1995 elections also reflected a disparity—51% of African Americans were registered compared to 60% of white residents.

#### 74.

Although Plaintiffs produced evidence of racial disparities in municipal employment, the Court finds that this evidence is not probative on the issue of intentional discrimination by the City Council.

#### 75.

Housing in LaGrange is highly segregated. Approximately 30% of LaGrange residents live in census blocks that are 100% racially segregated. According to the most recent census, 32.9% of white residents live in all-white census blocks, and 26.5% of the total African–American population lives in all-black census blocks.

76.

2.

In general, African–American residents of LaGrange live in housing that is inferior to the housing enjoyed by the white residents of LaGrange. Over 2% of African–American households lack complete plumbing facilities, but only .26% of white households lack plumbing. The southeast portion of La-Grange, which contains the highest concentration of African–Americans residents, is the "most lingering area of distressed housing." According to a videotape shown at trial, the predominantly black areas of LaGrange contain many more unpaved streets than are located in white areas of the city.

77.

In addition to segregated schools and polling places, many other areas of the La-Grange community were segregated until fairly recently. The city jail was racially segregated until 1979. Black and white police officers did not serve together as partners until 1973. Similarly, common carriers were legally required to maintain separate waiting rooms for white and "colored" intrastate passengers until the 1960s.

78.

Today, *de facto* segregation remains in many local organizations and churches. The Shriners and Masons have separate white and black lodges. Neither the Rotary Club nor the Highland Country Club have black members.

### III. CONCLUSIONS OF LAW

#### *Constitutional Claims*

1.

■ In order to prevail on their constitutional claims, Plaintiffs must establish that the City of LaGrange has maintained its at-large voting system based on a "discriminatory purpose." *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *NAACP v. Gadsden County School*, 691 F.2d 978 (11th Cir.1982). Plaintiffs have failed to carry this burden.

■ Plaintiffs do not need to establish a discriminatory purpose with direct evidence. *Rogers*, 458 U.S. at 618, 102 S.Ct. at 3276. Instead, whether discriminatory intent exists "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).

3.

Plaintiffs have offered no direct evidence of intentional discrimination by the City of LaGrange.

4.

■ In the context of allegedly unconstitutional voting systems, the following factors can be examined in order to determine the existence of discriminatory intent: (1) a lack of successful minority candidates, (2) the unresponsiveness of elected officials to the interests of minority citizens, (3) whether the state policy in favor of the challenged districts is tenuous, (4) past discrimination that prevents minorities from effectively participating in elections. *Rogers*, 458 U.S. at 621 n. 8, 102 S.Ct. at 3277 n. 8. (citing *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973)).

5.

Plaintiffs have established only one of the Zimmer factors—the lingering effects of past discrimination on the electoral process. As is the case with Georgia in general, La-Grange has an unmistakable history of discriminating against its black citizens. Today, although *de jure* discrimination has been eliminated, African–American citizens of La-Grange continue to enjoy fewer social, economic, and educational opportunities than LaGrange's white citizens. As discussed above, these disparities are stark. *See supra* Findings of Fact ¶ 69–90. In addition, these disparities perpetuate a racial disparity in the relative political power of each race.

#### 6.

■ However, any inference created by this circumstantial evidence is insufficient to overcome the other evidence that indicates a lack of a discriminatory animus. First, several of the *Zimmer* factors fail to support an inference of an impermissible racial animus on the part of the City Council. Second, the evidence concerning the City Council's decision to retain the at-large system indicates the absence of discriminatory intent.

Several of the *Zimmer* factors indicate a lack of discriminatory intent on the part of the City Council. These factors diminish any inference of discriminatory intent created by the other *Zimmer* factors.

First and most importantly, there has not been a complete absence of successful minority candidates in LaGrange. Glenn Robertson became a member of the city counsel in 1970 and continued to win elections for twenty years. Although he was unopposed in many of these elections, such lack of opposition can be attributed in part to his strength as a candidate.

In addition, the evidence does not establish that the City Council is unresponsive to the needs of the minority community. Several of Plaintiff's witnesses testified that the council had failed to address certain problems within the African–American community. However, these examples seemed to reflect the typical shortcomings of government entities rather than an institutional unresponsiveness to the minority community.

Furthermore, the city's justification for maintaining an at-large system is not tenuous. The city attempted to implement two different districting plans, but neither received approval by the Justice Department. Because the city was unable to formulate a districting plan that was acceptable to all constituencies—white residents, black residents, and the federal government—the city abandoned its plans to change the election system and retained the system that has been in place for well over a century. In addition, the at-large system of electing local government officials is used by a majority of the local governments in Georgia.

#### 7.

Plaintiffs claim that intentional discrimination can be inferred from the fact that the city knew that the at-large system would perpetuate the white domination of the City Council. On the other hand, significant, probative evidence exists which indicates that the city government made a good-faith attempt to resolve the districting controversy.

For example, in 1992, the Troup County NAACP suggested an end to the at-large system of electing the City Council. Accordingly, the NAACP proposed "the 3–3 plan"— i.e. three majority-minority districts and three majority-majority districts. In response to the NAACP proposal, the city did not attempt to preserve the at-large system. Instead, the City Council proposed their own districting plan—the "4–2" plan. At this time, Glen Robertson was the sole African–American member of the City Council. Therefore, the city's endorsement of a plan with two majority-minority districts does not indicate an attempt to perpetuate the *status quo* of white domination of local government.

Similarly, the subsequent actions of the City Council on the districting issue also reflect an absence of racial animus. After the Justice Department rejected the "4–2 Plan", the city did not abandon the idea of districting, which was a decision that likely would not have required preclearance by the federal government. Instead, the City Council appointed a bi-racial committee to evaluate the possible plans. This committee formulated, and the City Council approved, the 2–2–1–1–1 plan. This plan also could have increased black representation on the City Council, but the Justice Department rejected it.

#### 8.

Based on an evaluation of the foregoing factors, Plaintiffs have failed to establish that LaGrange has acted with a discriminatory purpose. Unlike Plaintiffs' claims under Section two of the Voting Rights Act, which are addressed below, Plaintiffs' constitutional

claims require a finding of purposeful discrimination. Because Plaintiffs have failed to establish this element of their constitutional claim, this claim must be dismissed.

### Section Two of the Voting Rights Act of 1965

#### 9.

Section two of the Voting Rights Act provides that

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any state or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in § 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

#### 10.

In order for multi-member districts to constitute a violation of Section two of the Voting Rights Act, Plaintiffs must establish, by the preponderance of the evidence, three "necessary preconditions." *Thornburg v.* *Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *Johnson v. De Grandy,* 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994); *Nipper v. Smith,* 39 F.3d 1494 (11th Cir.1994) (en banc), *cert denied,* 514 U.S. 1083, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995). First, the minority group "must ... demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766. Second, Plaintiffs must demonstrate that the minority group is "politically cohesive." *Id.* Third, Plaintiffs must establish that the "white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." *Id.*

#### 11.

Applying the fact-intensive *Gingles* factors requires the Court to conduct a "searching evaluation of the 'past and present reality' of the challenged electoral system in operation." *Nipper,* 39 F.3d at 1527 (quoting *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2762–63). No particular formula determines whether any of the factors has been satisfied. *De Grandy,* 512 U.S. 997, 114 S.Ct. 2647.

#### 12.

The first prong of the *Gingles* test requires more than the mere showing that drawing single-member districts is possible. Instead, the first factor requires the Court to consider whether it can fashion an appropriate remedy in the context of the particular system at issue. *Nipper,* 39 F.3d at 1530–31; *see also Holder v. Hall,* 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (holding that federal courts cannot order the alteration of the size of a local governmental body as a remedy for a violation of Section two of the Voting Rights Act).

#### 13.

The second prong of the *Gingles* test requires Plaintiffs to establish that the minority citizens of LaGrange are politically cohesive. *Nipper* 39 F.3d at 1522. Plaintiffs can establish this element with evidence that

"a significant number of minority group members usually vote for the same candidates." *Solomon v. Liberty County, Florida,* 899 F.2d 1012, 1019 (11th Cir.1990) (en banc) (Kravitch, J. specially concurring)

14.

■ The third prong of the *Gingles* test is satisfied when the Section two plaintiff establishes that the white voting bloc normally will "defeat the combined strength of minority support plus white 'crossover' votes." *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769; *Nipper* 39 F.3d at 1533. In other words, the second and third *Gingles* factor can be characterized as requiring Plaintiffs to establish "legally significant racially polarized voting." *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769.

15.

■ Applying the third *Gingles* prong does not depend exclusively on elections for which statistical evidence is available. To the contrary, an analysis of the *Gingles* test requires a searching examination of the totality of the circumstances. *De Grandy,* 114 S.Ct. at 2656, 512 U.S. at 1008–11. Accordingly, the key issue in vote dilution claim is not whether the minority voting strength was diluted in the elections that the parties' experts examined. Instead, the inquiry is whether the challenged electoral practice will have the effect of diluting, or perpetuating an existing dilution, of minority voting strength.

16.

■ Any "special circumstances" must be considered when determining whether a majority voting bloc "usually" defeats the minority-preferred candidate. *Gingles,* 478 U.S. at 57, 106 S.Ct. at 2769–70. Such special circumstances include incumbency, lack of opposition, single-shot voting, or "a temporary effect resulting from the filing of the vote dilution suit itself." *Id.*

17.

■ Incumbency is only one factor that is used in the broad analysis required in a Section two claim, and the involvement of an incumbent in an election does not render the election irrelevant to the *Gingles* test. *Nipper,* 39 F.3d at 1539 ("The badge of office should not be viewed as a talisman by court, sufficient in of itself to deem an election involving an incumbent irrelevant to a plaintiff's vote dilution claim.").

18.

■ Elections involving contests between African–American and white candidates present the most relevant evidence in evaluating the existence of the second and third *Gingles* factors. *Nipper,* 39 F.3d at 1539. Such races present voters with a clear racial choice, and therefore best illustrate the degree to which voters in the jurisdiction at issue are motivated by race. *See also Carrollton Branch of the NAACP v. Stallings,* 829 F.2d 1547, 1559 (11th Cir.1987), *cert. denied,* 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *Westwego Citizens for Better Gov't v. Westwego,* 872 F.2d 1201, 1208 n. 7 (5th Cir.1989).

19.

■ On the other hand, the results of elections involving only white candidates are also relevant to the second and third *Gingles* factors. *Nipper,* 39 F.3d at 1540 ("[W]e do not foreclose the consideration of electoral races involving only white candidates where the record indicates that one of the candidates was strongly preferred by black voters."); SCLC, 56 F.3d at 1293 (holding that the district court properly considered as "relevant evidence" both elections involving black and white candidates and elections between two white candidates).

20.

Generally, direct evidence of the respective voting patterns of white and black voters is not available. Therefore, numerous courts have approved of regression analysis and homogenous precinct analysis as appropriate

statistical means for estimating the voting patterns of minority and majority citizens. *See e.g., Gingles,* 478 U.S. at 61, 106 S.Ct. at 2771–72; *SCLC v. Sessions,* 56 F.3d 1281, 1290 (11th Cir.1995) (en banc); *Solomon,* 899 F.2d at 1019.

## 21.

Likewise, in evaluating the second and third *Gingles* elements, courts have approved the use of "exogenous" elections to estimate racial voting cohesion within the challenged system. *See e.g. Carrollton Branch of NAACP,* 829 F.2d at 1556.

## 22.

■■■■ Although a very broad range of evidence must be considered in applying the *Gingles* factors, not all of this evidence carries equal weight. Evidence that relates to elections for the offices at issue (i.e., endogenous elections) is the most probative evidence. Therefore, in this case, evidence of voting patterns in LaGrange City–Council elections is the most relevant and most important evidence to Plaintiffs' Section two claim. The relevant evidence is not limited to statistical evidence or expert testimony. Instead, courts "must also examine other evidence in the totality of the circumstances, including the extent of the opportunities minority voters enjoy to participate in the political process." *De Grandy,* 512 U.S. at 1011–12, 114 S.Ct. at 2657.

■■■■ Evidence concerning exogenous elections is less probative of the key issues in a vote dilution case. Both parties correctly argue that evidence of exogenous elections are part of the totality of the circumstances that must be examined when applying the *Gingles* factors. However, the voting patterns of exogenous elections are less relevant than endogenous elections. Therefore, the voting patterns in exogenous elections cannot defeat evidence, statistical or otherwise, about elections for the LaGrange City Council.

## 23.

■■■■ If the Plaintiffs establish the three prongs of the *Gingles* test, the Court must examine the "totality of the circumstances" to determine whether minority voters have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. *De Grandy,* 512 U.S. at 1011–12, 114 S.Ct. at 2657.

## 24.

■■■■ In evaluating the totality of the circumstances, the following seven "Senate Report Factors" are considered in evaluating whether minority voters have less opportunity to participate in the political process:

1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6) whether political campaigns have been characterized by overt or subtle racial appeals;

7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Nipper,* 39 F.3d at 1511.

**25.**

█ In addition to the Senate factors, a court may consider the degree of responsiveness of elected officials to the particular needs of the minority group, and the policy justifications for the voting practice. *Little Rock School Dist. v. Pulaski County Special School Dist. # 1,* 56 F.3d 904, 910 (8th Cir. 1995).

**26.**

█ These factors are not exclusive, and Plaintiffs need not establish a majority of factors for the totality of the circumstances to support a finding of vote dilution. *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2763–64. Furthermore, none of these factors is dispositive. *United States v. Marengo County Comm'n,* 731 F.2d 1546, 1566 (11th Cir.1984), *cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984).

**27.**

█ In addition, this Court must remember that "[f]ederal court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson,* 515 U.S. 900, ——, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995).

***Application of Section Two of the Voting Rights Act to the Facts***

**28.**

█ Plaintiffs have established the first *Gingles* factor—that the African–American community in LaGrange is sufficiently large and geographically compact to constitute a majority in a single member district. *See supra* Findings of Fact ¶¶ 7–8.

**29.**

Plaintiffs introduced a number of feasible districting plans for LaGrange City–Council elections. For example, one plan, which was drafted by the Legislative Reapportionment Office, includes three majority African–American districts. These districts are relatively compact and reasonably shaped. *See,* Plaintiffs' Exhibit 186. Similarly, Plaintiffs' demographer, Mr. William Cooper, submitted a districting plan which also includes three majority African–American districts of reasonable compactness and shape. *See* Plaintiff's Exhibit 206.

**30.**

█ This Court finds that Plaintiffs have established the existence of minority bloc voting in LaGrange. Both the expert and lay testimony indicate that African–American voters in LaGrange tend to vote for the same candidate.

Both experts' reports support this finding. Out of the twelve statistically significant elections that Dr. Davis analyzed, he estimated that in seven elections, at least 80% of black voters supported the same candidate. Furthermore, in all but one of the twelve statistically significant elections that Dr. Davis analyzed, a majority of black voters supported the same candidate. Similarly, in his homogenous precinct analysis, Dr. Maggiotto analyzed twenty-four elections. Out of these elections, over 80% of black voters supported the same candidate twelve times. In addition, at least a majority of black voters supported the same candidate in twenty-one of twenty-four elections.

Likewise, the lay testimony also indicated that the minority voters in LaGrange tend to support the same candidate. All of the lay witnesses who testified for Plaintiffs expressed the opinion that minority voters in LaGrange tend to vote for minority candidates.

**31.**

█ Plaintiffs have also established the existence of majority-bloc voting in LaGrange. Again, the testimony of both experts support this conclusion.

First, Dr. Davis offered his opinion that white crossover support for black candidates was generally low, and his analysis supports this conclusion. Out of the eleven statistically significant elections for which he determined the crossover vote, none of the African–American candidates received a majority of the white vote.

Moreover, Dr. Maggiotto did not opine that white voters do not vote as a block in LaGrange, and the elections that he analyzed would not support such a conclusion. In the twenty-four elections that he examined, the majority of white voters supported a single candidate nineteen times.

32.

■ At the same time, the statistical evidence in this case is inconclusive with respect to the third *Gingles* factor. First, the testimony of Plaintiffs' expert witness, Dr. Davis, taken alone, does not sustain Plaintiffs' burden. Out of the fifteen elections that Dr. Davis analyzed, only ten are relevant to this issue. *See supra* Finding of Fact ¶ 48. Out of these ten elections, the African–American candidate prevailed five times. Therefore, Dr. Davis' report would appear to establish that African–American candidates do not, in fact, usually lose to the majority-preferred candidate.

The Court is required to consider each election, however, in view of any "special circumstances" which surround it. *Gingles*, 478 U.S. at 57, 106 S.Ct. at 2769–70. The special circumstances include incumbency, party affiliation, and the fact that the 1995 election occurred during this litigation. Therefore, although his conclusions establish the existence of racially polarized voting, Dr. Davis' report does not establish whether minority candidates are, or are not, usually defeated.

On the other hand, upon initial review, Dr. Maggiotto's report suggests that Plaintiffs have failed to establish the third *Gingles*

factor. Dr. Maggiotto examined ten elections for the LaGrange city council. According to Dr. Maggiotto's report, the majority of African–American voters supported a single candidate in all ten elections. Out of these ten elections, the African–American preferred candidate prevailed six times.[2] Similarly, out of the five inter-racial elections in which the African American voters supported the African–American candidate, the African–American candidate won two elections.

When taken at face value, Dr. Maggiotto's report indicates that in LaGrange, the minority-preferred candidates usually are not defeated by majority-bloc voting. Once special factors are considered, however, Dr. Maggiotto's evidence does not carry the weight which Defendants contend. First, even when taken at face value, Dr. Maggiotto's report offers only a small view of a much larger picture. Dr. Maggiotto analyzed only two election cycles. LaGrange has been using the at-large method of electing City–Council members since long before the Voting Rights Act was adopted. Accordingly, deciding whether Plaintiffs have established legally significant racially polarized voting on such a small sample would be inconsistent with the searching inquiry into the totality of the circumstances that is required in applying the *Gingles* test.

Moreover, Dr. Maggiotto's report cannot be taken at face value. Once the special circumstances that surrounded the elections which Dr. Maggiotto analyzed are considered, his statistics appear largely inconclusive.

The results of the 1995 elections, which comprised the majority of Dr. Maggiotto's analysis, are not particularly probative of whether legally significant racially polarized voting exists in LaGrange. The 1995 election was held while this litigation was pending. As *Gingles* suggests, this fact alone renders the results suspect. In addition, evidence was introduced at trial that would allow the inference that the white establishment of La-

---

**2.** As discussed above, this Court questions Dr. Maggiotto's definition of "winning" the exogenous elections. He defined "winning" as receiv-
ing a plurality, but LaGrange employs a majority-vote requirement for City–Council elections.

Grange may have solicited Reverend Ware's candidacy in order to influence the outcome of this litigation. In any event, the evidence establishes that districting and this litigation were uppermost in the mind of the voters during the 1995 election.

Once the results of the 1995 election are disregarded, Dr. Maggiotto's analysis of endogenous elections is comprised of a single election cycle—the 1991 City Council elections. These elections present a familiar scenario. Mr. Glenn Robertson, running as an incumbent, was the sole successful African–American candidate for the LaGrange City Council.

### 33.

■ Because the expert/statistical evidence about elections to the LaGrange city council is not determinative in this case, this Court must look to other evidence about LaGrange City elections. When the totality of the circumstances are considered, the evidence strongly supports the conclusion that legally significant racially polarized voting exists in elections for the LaGrange City Council.

First and most important, historically, minority candidates for LaGrange City Council have achieved extremely limited success. Before 1995, only one minority candidate, Mr. Robertson, was elected to the LaGrange City Council. Even including the election of two African–American candidates to the LaGrange City Council in 1995, Mr. Robertson remains the only non-incumbent, African–American candidate to win a contested election for the LaGrange City Council.

Second, very credible lay testimony supports the conclusion that African–American candidates for the LaGrange City Council are usually defeated by majority-bloc voting. Representative Von Epps testified that in his 1992 race for the State Legislature, he won all of the majority African–American districts, but won none of the majority-white districts. Similarly, County Commissioner Richard English testified that he did not believe that African–American candidates could successfully compete for at-large seats on either the County Commission or the City Council. Moreover, Mr. English also testified that he and other African–American candidates would not even run for at-large City–Council seats because of the perception that such campaigns would not succeed. This testimony comports with the strikingly low number of African–American candidates for the LaGrange City Council over the last one hundred years.

Finally, the evidence indicates that the vestiges of LaGrange's history of discrimination continue to impact the ability of LaGrange's African–American citizens to elect their chosen candidates. As discussed above, the African–American citizens of LaGrange traditionally enjoyed fewer educational opportunities than their white counterparts. Closely related to education is the fact that the African–American citizens of LaGrange also enjoy markedly lower economic status. The lower economic power of LaGrange's African–American community continues to translate into diminished political power. As several witnesses testified, African–American City–Council candidates receive considerably less financial support for their candidacies than white candidates.

In addition, the official discrimination which existed until relatively recently made it impossible, even after passage of the Voting Rights Act, for an African–American candidate to run as an incumbent. The election results indicate that incumbency is a powerful factor in LaGrange politics. As Dr. Davis noted, "historically, the only way that one could become an incumbent in the city of LaGrange is to be white."

### 34.

■ The Senate factors support a finding of vote dilution. On the one hand, several of the Senate factors, among other relevant factors, weigh against a finding of vote dilution. For example, African–American candidates have been elected in LaGrange, and the City Council has not been unresponsive to the needs of the African–American community. However, when con-

sidered together, the relevant factors support Plaintiffs' allegations.

First, LaGrange and the state of Georgia have a long history of official discrimination against African–American citizens. This discrimination has adversely impacted the political power of LaGrange's black citizens. *See supra* Findings of Fact ¶¶ 69–72 and 81.

Second, to some extent, the voting in La-Grange is racially polarized. In terms of the *Gingles* factors, this Court has concluded that voters of both races tend to support a single candidate. *See supra* Findings of Fact ¶¶ 66–67.

Third, LaGrange employs potentially dilutive electoral practices in City–Council elections. These practices include a majority vote requirements and designated posts or seats. The designated post system can defeat the ability to use "single-shot" or "bullet" voting. Majority vote requirements can prevent the minority from achieving enough votes to get elected.

Fourth, although no evidence of a formal candidate slating process was introduced, African–American voters appear to have been unable to sponsor candidates. The absence of African–American candidates is striking. For example, prior to 1995, only three African–American candidates ran for LaGrange City Council. Conversely, in this same time period, there were forty-five opportunities to run for the LaGrange City Council. In addition, whenever an African–American has appeared on the ballot, he or she has received significant support from the African–American voters. This fact suggests a lack of opportunity, rather than a lack of inclination, to sponsor minority candidates.

Fifth, this Court has already noted the extent of past discrimination and its effects on the political power of the black citizens of LaGrange. *See supra* Conclusions of Law ¶ 29.

Sixth, some evidence exists that recent LaGrange City–Council elections have in-

cluded racial appeals. For example, Plaintiffs produced evidence that in 1995, the issue of districting was a racially charged issue. Plaintiffs produced additional evidence that the white candidates who opposed districting received significant support from the white community and prevailed. In addition, Plaintiffs Cofield and Cox testified that the public debate about the consolidation of the local schools was marked by racial appeals and arguments.

## IV.  CONCLUSION

Plaintiffs have failed to establish their constitutional claims. Accordingly, Plaintiffs' claims for relief that are based on the United States Constitution are hereby **DENIED.**

Plaintiffs have established a violation of Section two of the Voting Rights Act. Defendants are hereby **ENJOINED** from holding any elections under the current at-large system. The parties shall submit a joint proposal for a new election plan on or before March 14, 1997. If the parties cannot agree on a plan within this time period, Defendants shall submit a proposed plan with a supporting brief of no more than twenty-five (25) pages no later than March 28, 1996. Plaintiffs shall respond to Defendants' proposal with their own proposal and supporting brief of no more than twenty-five (25) pages on or before April 11, 1997. Defendants may submit reply brief of no more than ten (10) pages to Plaintiffs' proposal no later than April 18, 1997.

The Court will consider approving a plan for single-member districts or a combination of single-member districts and at-large districts. In view of the previous difficulty in reaching an agreement on a districting plan, the Court encourages the parties to consider different options such as removing the majority-vote requirement or considering a plan based on proportional representation.[3]

SO ORDERED.

---

**3.** By "proportional representation" this Court

means a system that employs multimember dis-

tricts, does not include a majority/plurality vote requirement, and/or allocates seats in proportion to votes received. *See,* Andrea Bierstein, *Millennium Approaches: The Future of the Voting Rights Act After Shaw, De Grandy, and Holder* 46 Hastings L.J. 1457, 1527 (1995).